# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 82
In the Matter of Patricia Walsh,
　　　Appellant,
　　v.
New York State Comptroller et al.,
　　　Respondents.

Jonathan I. Edelstein, for appellant.
Victor Paladino, for respondents.

FEINMAN, J.:

An inmate accidentally fell as she attempted to exit the back of a transport van,

injuring petitioner, a Nassau County correction officer. The question before us is whether

petitioner's injuries were sustained by, or as the natural and proximate result of, "any act

- 1 -

of any inmate," within the meaning of Retirement and Social Security Law § 607-c (a). We conclude that they were.

On March 19, 2012, petitioner and fellow correction officer Thomas Cocchiola were directed to transport a female inmate from a court to the Nassau County jail. When they arrived at the court, they found that the inmate had difficulty standing and appeared to be under the influence of drugs or alcohol. The officers escorted the inmate, who was handcuffed and weighed about 200 pounds, from the basement area up to the garage. The inmate was not steady on her feet, and the officers assisted her as she walked.

The officers led the inmate to the transport van, and helped her maintain her balance as she climbed the steps into the van. Upon arriving back at the jail, petitioner opened the back of the van and instructed the inmate to exit. The inmate took one to two steps forward and fell out of the van head first, landing on petitioner. Both petitioner and the inmate fell to the ground. Officer Cocchiola and other officers assisted in lifting the inmate off petitioner, and petitioner was taken to a hospital. Petitioner's rotator cuff was torn, her cervical spine was damaged, and her lower back was injured.

Based on this incident and her resulting injuries, petitioner applied for performance-of-duty disability retirement benefits pursuant to Retirement and Social Security Law § 607-c (a). Respondents New York State Comptroller and New York State and Local Employees' Retirement System denied her application on the ground that the "alleged cause of disability" "was not the result of an act of any inmate or person confined in an institution" within the meaning of section 607-c. After conducting a hearing upon

petitioner's request for a redetermination, the hearing officer recommended denying

petitioner's application. The hearing officer reasoned that:

> "Altercations between inmates and between inmates and officers, resulting in injuries to correction officers, were the impetus for the legislative action cited here. Reference was specifically made to officers' exposure to violence, assault, transmissible disease and other life threatening conditions. Those factors are not present here. The applicant's mishap is more appropriately attributed to her failure to carefully execute her task of removing an inmate from the van."

Respondents then issued a final determination denying petitioner's application.

Petitioner then commenced this CPLR article 78 proceeding, seeking to annul

respondents' determination. Upon transfer from Supreme Court, the Appellate Division

confirmed the determination and dismissed the petition (161 AD3d 1495, 1497 [3d Dept

2018]). The Court stated that, although the phrase "any act of any inmate" in section 607-

c (a) is not statutorily defined, the Appellate Division has interpreted this language to

require a showing that the claimed injuries "were caused by direct interaction with an

inmate" and, further, were "caused by some affirmative act on the part of the inmate" (id.

at 1496). While recognizing that an "affirmative act" need not be "intentionally aimed" at

the officer, the Court stated that the act needs to be "volitional or disobedient" in a manner

that proximately causes the injury (id.). The Court reasoned that, in this case, "by all

accounts, the inmate in question could barely walk or stand unassisted," and "the hearing

testimony reflects that she simply lost her footing and fell" (id. at 1497). The Court

concluded that petitioner's injuries did not occur contemporaneously with, and flow

directly, naturally and proximately from, any disobedient and affirmative act of the inmate (id.). This Court granted leave to appeal (see 32 NY3d 905 [2018]).

In CPLR article 78 proceedings to review determinations of administrative tribunals, this Court's typical standard of review is whether there was substantial evidence to support the hearing officer's decision (Matter of Wilson v City of White Plains, 95 NY2d 783, 784-785 [2000]). Here, however, because an issue of statutory interpretation underlies this question, we engage in de novo review of the statutory interpretation (see National Energy Marketers Assn. v New York State Pub. Serv. Commn., 33 NY3d 336, 347 and n 5 [2019], rearg denied 33 NY3d 1130 [2019]). Because the meaning of "any act of any inmate" is an issue of pure statutory interpretation, we "need not accord any deference to the agency's determination" (Matter of DeVera v Elia, 32 NY3d 423, 434 [2018]).

"When presented with a question of statutory interpretation, a court's primary consideration is to ascertain and give effect to the intention of the Legislature" (Nadkos, Inc. v Preferred Contrs. Ins. Co. Risk Retention Group LLC, 34 NY3d 1, 7 [2019] [internal quotation marks omitted], quoting Matter of Lemma v Nassau County Police Officer Indem. Bd., 31 NY3d 523, 528 [2018]). We have long held that the statutory text is the clearest indicator of legislative intent, and that a court "should construe unambiguous language to give effect to its plain meaning" (id.). "In the absence of a statutory definition, we construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase" (id. [internal quotation marks omitted], quoting Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016]). Where the statutory

language is unambiguous, a court need not resort to legislative history (He v Troon Mgt., Inc., — NY3d —, 2019 NY Slip Op 07643, at *2 [2019]).  Further, a statute "must be construed as a whole and [ ] its various sections must be considered together and with reference to each other" (Matter of New York County Lawyers' Assn. v Bloomberg, 19 NY3d 712, 721 [2012]).

Retirement and Social Security Law § 607-c (a) provides the circumstances under which county correction officers are entitled to performance-of-duty disability retirement benefits.  As relevant here, it states that a county correction officer

> "who becomes physically or mentally incapacitated for the performance of duties as the natural and proximate result of an injury, sustained in the performance or discharge of his or her duties by, or as the natural and proximate result of any act of any inmate or any person confined in an institution under the jurisdiction of such county, shall be paid a performance of duty disability retirement allowance . . ." (emphasis added).

Section 607-c is one of several statutes in the Retirement and Social Security Law that use the term "act of any inmate" in connection with providing performance-of-duty disability retirement benefits to different members of the retirement system (see e.g. Retirement and Social Security Law § 507-c [providing benefits to uniformed personnel in the New York City Department of Correction]; see also id. §§ 63-a, 63-b, 507-b).  The term "act of any inmate" was originally used in sections 63-a and 507-b, which provide benefits to members

in the "uniformed personnel in institutions under the jurisdiction of the department of corrections and community supervision or a security hospital treatment assistant."[1]

The term "any act of any inmate" is not defined in the Retirement and Social Security Law.  Petitioner contends that the Appellate Division erred in restricting the word "act" in section 607-c (a) to "volitional or disobedient" acts.  We agree and conclude that our analysis need not go beyond the statutory text because the term's plain meaning and the overall context provided by section 607-c compel an interpretation of "any act of any inmate" that includes both voluntary and involuntary conduct of an inmate, including the accidental fall at issue here.

"Act" is a word of "ordinary import," and thus it should be given its "usual and commonly understood meaning" (see Nadkos, Inc., 34 NY3d at 3).  Dictionaries broadly define "act."  For example, Black's Law Dictionary defines "act" as "something done or performed, esp. voluntarily; a deed" (Black's Law Dictionary 24-25 [7th ed 1999]).[2]

_____

[1] Each statute requires "an act of any inmate" or "any act of any inmate."  It does not appear that the legislature distinguished between "an act" and "any act."  Apart from this difference, the legislature incorporated the same language into each subsequent statute.

[2] The Seventh Edition of Black's Law was published in 1999, the year section 607-c was enacted.  The definition provided therein is the same as in the current, Eleventh Edition (Black's Law Dictionary [11th ed 2019], act).  The dissent relies on the Sixth Edition, which, published in 1990, was the current edition when sections 63-a and 507-b were enacted, and defines an "act" as requiring the "actor's will" (dissenting op at 5-6).  But that definition cites to the definition in the Restatement (Second) of Torts, which differs from the commonly understood meaning of "act" because the Restatement definition is intended to ensure that tort liability be imposed only with respect to volitional acts (see Restatement [Second] of Torts § 2, Reporter's Note, Comment *a* ["some outward manifestation of the defendant's will is necessary to the existence of an act which can subject him to liability" (emphasis added)]).  Moreover, as the dissent points out (dissenting op at 7), the Sixth Edition, in defining the word "involuntary," uses the term "involuntary act"—

Black's Law Dictionary also quotes the Model Penal Code § 1.13, which defines "act" as a "bodily movement whether voluntary or involuntary." Perhaps most importantly, in the Penal Law, the New York legislature defined "act" as "a bodily movement," and provided a separate definition for "voluntary act" (Penal Law § 15.00 [1]-[2] [1965]).[3]

Despite disparities among these definitions, the usual and commonly understood meaning of the word "act," including the meaning adopted by the legislature in the Penal Law, does not comprise a requirement of voluntariness.[4] Indeed, from as early as 1871, in various types of cases, this Court has used the term "involuntary act," indicating that acts can be involuntary (see e.g. Giryluk v Giryluk, 23 NY2d 894, 895 [1969] ["the signing of the confession of judgment was an involuntary act on the part of the wife" (emphasis added)]; Weed v Mut. Ben. Life Ins. Co., 70 NY 561, 561 [1877] ["the involuntary act of an insane person" (emphasis added)]; Mallory v Travelers' Ins. Co., 47 NY 52, 56 [1871] ["if it was such that he could not be held in his own mind to know that he was doing an act which would produce death, then he was an involuntary agent, and the result of that involuntary act producing death was an accident" (emphasis added)]).

---

demonstrating that, even when the Sixth Edition was published, it was commonly understood that acts can be involuntary (Black's Law Dictionary 827 [6th ed 1990]).
[3] Penal Law § 15.00 (2) defines "voluntary act" as "a bodily movement performed consciously as a result of effort or determination." Section 15.00 (5) defines "to act" as "either to perform an act or to omit to perform an act."
[4] Contrary to the dissent's suggestion (dissenting op at 9), we are not saying that the Retirement and Social Security Law incorporates the Penal Law's definition of "act." The Penal Law definition nonetheless establishes that the legislature was aware of—and indeed drafted—a broad definition of the word "act."

Moreover, falling is commonly understood to be an act. Merriam-Webster's defines the noun "fall" as "the <u>act</u> of falling by the force of gravity" (Merriam-Webster's Collegiate Dictionary 418 [10th ed 1996]). And this Court repeatedly uses the term "<u>act</u> of falling" (see e.g. Keavey v New York State Dormitory Auth., 6 NY3d 859, 860 [2006] [the "<u>act</u> of <u>falling</u> into a five- to six-inch gap between insulation boards" (emphasis added)]; Ithaca Tr. Co. v Driscoll Bros. & Co., 220 NY 617, 618 [1917] ["they could not find the defendant guilty of negligence unless the specific <u>act of falling</u> was caused in whole or in part by the opening in the floor" (emphasis added)]).

In section 607-c (a), the legislature chose to use the broad term "any act of any inmate." If the legislature intended to exclude the injuries at issue here, it could have easily drafted the statutory language more restrictively, for example, by adding limitations to the word "act." In fact, the legislature did just that in subdivision (f) of the same statute (see Retirement and Social Security Law § 607-c [f] ["by, or as the natural and proximate result of an <u>intentional or reckless act</u> of any civilian visiting" (emphasis added)]). While many ways in which the legislature could have narrowed the term come easily to mind, it is hard to imagine how it could have written the statute more broadly.

Though the word "act" broadly includes voluntary and involuntary conduct, the statute is not without limitation. First, the statute requires that the injury be sustained "by" or "as the natural and proximate result of" the act. The statute further limits covered acts to those "<u>of</u> any inmate" (id. § 607-c [a] [emphasis added])—the act, whether voluntary or involuntary, must be attributable to the inmate. In other words, section 607-c (a) covers

any conduct originating from an inmate's internal processes, including volitional and nonvolitional movements, such as an accidental fall.

The dissent criticizes us for failing to consider the "spirit and purpose" of the statute (dissenting op at 2, 16-17). Our task, however, is to give effect to the text. But, even if we were to consider the legislative history, it is inconclusive. While we agree with the dissent insofar as there seemed to have been a desire to provide protections to correction officers because they "come into daily contact with certain persons who are dangerous, profoundly anti-social and who pose a serious threat to their health and safety" (Governor's Approval Mem, Bill Jacket, L 1996, ch 722 at 9), inmates may be "dangerous" and pose a "serious threat" as much through their involuntary acts as by their voluntary acts.

Here, the inmate took one to two steps, lost her balance, and landed on petitioner, injuring her. Petitioner's injuries were thus sustained by "any act of any inmate," i.e., the inmate's fall on petitioner. Accordingly, the judgment of the Appellate Division should be reversed, with costs, and the matter remitted to the Appellate Division, with directions to remand to respondents for further proceedings in accordance with this opinion.

Matter of Walsh v New York State Comptroller et al.

No. 82

WILSON, J. (concurring):

I concur completely with the majority. I write separately to make an additional point: the structure of the statute and its legislative history both support the majority's conclusion that the term "act" includes volitional and nonvolitional conduct.

- 1 -

I.

Section 607-c(a) of the Retirement and Social Security Law states that a county corrections officer:

> "who becomes physically or mentally incapacitated for the performance of duties <u>as</u> the natural and proximate result of an injury, sustained in the performance or discharge of his or her duties by, <u>or as</u> the natural and proximate result of any act of any inmate or any person confined in an institution under the jurisdiction of such county, shall be paid a performance of duty disability retirement allowance . . . " (emphasis added).

The two "as" clauses separated by "or" make clear that there are two separate paths by which an officer may demonstrate the entitlement to recovery under the statute. Thus, a corrections officer qualifies for performance of duty benefits if the officer becomes incapacitated either (1) "as the natural and proximate result of an injury, sustained in the performance or discharge of his or duties by . . . any act of any inmate" or (2) "as the natural and proximate result of any act of any inmate" (Retirement and Social Security Law § 607-c[a]). The statute is simpler to understand if we take the clauses in reverse order.

Under the second clause, an officer recovers if she becomes disabled as "the natural and proximate result of any act of any inmate." That route provides recovery for all officer disabilities where the disability is a natural and foreseeable result of an inmate's act. Thus, it covers intentional acts of inmates, volitional acts of inmates, and even acts of inmates that involve no direct physical contact with the officer – so long as the disability is proximately caused by the act. Therefore, this second path covers the garden-variety of inmate-caused officer disabilities – not just disabilities caused by an officer subduing a

violent inmate or an officer who is the target of an inmate's physical attack, but also acts of inmates that involve no direct contact between the inmate and the officer. For example, if an inmate has booby trapped his cell, and an officer conducting a search of the cell becomes disabled by the booby trap, the second clause would cover the officer so long as the disability was a natural and foreseeable consequence of the inmate's act.

Now to the first path. Because under the second route the disability must be the natural and proximate result of any act of any inmate, the first clause must be understood to provide coverage in situations not reached by the second. What acts of inmates that injure an officer do so in an unforeseeable way? Nonvolitional acts. Unlike the second clause, the first clause does not require that an inmate's act proximately causes an officer's disability. Instead, it requires that the officer's *injury* be caused "by . . . any act of any inmate," and that the officer's *disability* flow proximately from the injury. That is, the first path reaches acts of inmates where the inmates' acts are not the proximate cause of the injury, so long as the disability is the sort that would ordinarily flow from that type of injury.

Although it might be possible to dream up some volitional act of an inmate that injures an officer but lacks proximate cause, the legislature surely was concerned with real-world occurrences, not Rube-Goldbergesque inventions. Seizures, actions by mentally unstable inmates that are involuntary, acts by inmates under the influence of drugs, involuntary acts by inmates who are ill are all among the hazards corrections officers regularly face. The first path, then – aimed at acts for which the injury is not foreseeable

– exists to reach nonvolitional acts of inmates. However, the legislature restricted that path to injuries sustained while an officer was performing her duties, and further limited to disabilities that proximately flowed from the injury. For example, if during a seizure, an officer is injured by the inmate's nonvolitional acts, even if the officer's resulting disability might not be the foreseeable result of an inmate's seizure (hence barring recovery under path two), path one provides for recovery if the officer was performing her duties when injured and if the injury (e.g., spinal damage) was the proximate cause of the disability.

Importantly, if we were to read this statute as the dissent does, to include only affirmative or volitional acts of inmates, there would be no reason to have the first clause at all. Every affirmative act would fall under the second clause, because all volitional acts of inmates resulting in an officer's disability would have proximately caused the disability. If the first clause is to retain any meaning, it must cover some "acts" not covered by the second clause. Those acts include direct contact between officers and inmates in which the inmate's act did not proximately cause the disability. Giving all parts of the statute meaning, as we should whenever possible (Rocovich v Consolidated Edison Co., 78 NY2d 509, 515 [1991]), the statute requires "act" to include both volitional and nonvolitional acts. Under the first route, an officer will be able to recover if his or her injury arises from physical contact with an inmate regardless of whether the inmate's act was volitional. Under the second route, an officer recovers only if the injury is proximately caused by an act of an inmate regardless of whether the inmate made physical contact with the officer. Therefore, an "act" need not be volitional under section 607-c(a).

Here, even if the inmate's act of falling out of the van and on top of Officer Walsh was involuntary, under the first clause of the statute Officer Walsh would be entitled to recover, so long as her injury was the proximate cause of her disability. She was injured by an act of an inmate and was engaged in the performance of her duties. As the majority concludes, her injuries "were thus sustained by 'any act of any inmate'" (majority op at 9).

## II.

Contrary to the dissent's interpretation, a careful reading of the legislative history supports the majority's conclusion that "act" includes both volitional and nonvolitional acts. As the dissent notes, the legislature provided enhanced benefits to corrections officers because a defining feature of their job is that they "come into contact with" inmates.

Of course, as the dissent recognizes (see dissenting op at 11, 16), interpreting "act" to include both volitional and nonvolitional acts will result in the provision of benefits to more corrections officers than if act included only volitional acts. That is what the legislature intended. Although the dissent bemoans the result that an inmate's misstep or fall on top of an officer will result in benefits (id.), the legislative history suggests the purpose of the statute was to provide enhanced benefits to officers because they "come into daily contact with" inmates (Gov Approval Mem, Bill Jacket, L 1996, ch 722, at 5). There is no suggestion that the contact need be volitional.[1] The history further suggests the statute

---

[1] The consistent use of passive words in the legislative history also lends support to our belief that the legislature meant to provide benefits for inmates' nonvolitional acts. In addition to the use of the passive "come into contact with," rather than a more active phrase, the legislative history also relies on phrases like "exposed to" and "sustains" – language

was intended to increase the amount of benefits the state would pay out to its employees (see generally Budget Report, Bill Jacket, L 1996, ch 722, at 7-8). That this statute does in fact provide more benefits to more officers is consistent with its express purpose: expanding benefits to corrections officers because they come into daily contact with inmates.

The selection of a two-tier system as opposed to a three-tier system further supports the majority's conclusion that "act" includes nonvolitional acts. Unlike police officers, who receive benefits under a three-tier system (see generally Kelly v DiNapoli, 30 NY3d 674, 689 [2018] [Wilson, J., dissenting]), section 607-c provides just two tracks – one for ordinary retirement benefits and one for performance of duty benefits. Accounting for just two tracks, the budget report noted that this statute "would provide a greater disability benefit to state [corrections officers] . . . than that afforded to most other Tier 2, 3, and 4 state and local employees" (Budget Report, Bill Jacket, L 1996, ch 722, at 7-8). Thus, the legislature deliberately passed a bill that provided for enhanced benefits for corrections officers on a two-tier system, superior to those available on the three-tier system.

This makes perfect sense: unlike police officers who often face dangerous conditions but also often engage in activities that pose little or no risk, corrections officers spend every moment of their working lives inside the prison walls, surrounded and outnumbered by inmates who have been convicted of crimes, many quite serious.

---

that conspicuously lacks the affirmative nature one would expect if the legislature intended to only include volitional acts of inmates.

Corrections officers "work in a setting that necessitates a strong disability protection in the event of a career ending injury" (Sponsor's Mem, Bill Jacket, L 1999, ch 639, at 5). That constant contact with inmates led to the legislature's electing to compensate corrections officers, who are "required to work daily with the most dangerous persons in our society" (Sponsor's Mem, Bill Jacket, L 1996, ch 722, at 3), on a two-tier system.

Rather than "undermin[ing]" the legislature's goals (dissenting op at 11), the interpretation of "act" to include both volitional and nonvolitional acts better conforms to the legislature's expectation that section 607-c would expand the pension system and provide more corrections officers more benefits under a two-tier system. Taken together with the text and the structure of the statute, those considerations establish that "act" was intended to include both nonvolitional and volitional acts.

Matter of Walsh v New York State Comptroller et al.

No. 82

RIVERA, J. (dissenting):

Performance-of-duty pension benefits are available under Retirement and Social Security Law § 607-c (a) only to those correction officers who suffer a permanent disability from injuries proximately caused by "any act of any inmate." Both the text of the statute

- 1 -

and the legislative history demonstrate that the legislature intended to limit these enhanced benefits—to be distinguished from ordinary disability benefits—to cases involving volitional inmate conduct, in recognition of the inherent dangers of working in a carceral environment, in close proximity to a prison population.

Here, because it is undisputed that the inmate accidentally slipped and fell on petitioner, the injuries are not the result of an act of an inmate and so the Comptroller properly denied her request for performance-of-duty benefits.  The majority's holding that an "act" means any physical movement of an inmate, and thus includes an inmate's slip and fall, is based on a misreading of the text and secondary sources, all the while ignoring the "spirit and purpose of the statute and the objectives sought to be accomplished by the legislature" (Matter of Hernandez v Barrios-Paoli, 93 NY2d 781, 786 [1999]).  I dissent.

I.

Petitioner Patricia Walsh, a Nassau County Sheriff's Department corrections officer transporting an inmate from a court appearance to the county jail, was injured after she directed the inmate to exit the van and the inmate fell on top of her.  Petitioner sought performance-of-duty (POD) disability retirement benefits under Retirement and Social Security Law (RSSL) § 607-c (a), claiming permanent disability due to the injuries suffered as a result of her contact with the inmate during the fall.

The New York State Comptroller denied the benefits and petitioner requested a hearing and reconsideration.  At the hearing, petitioner testified that the inmate appeared intoxicated or high on drugs and fell out of the van as she exited, hitting the pavement and

landing on petitioner, who attempted to prevent the fall. The other correction officer who assisted with the transport similarly testified that the inmate appeared to be under the influence of alcohol or drugs and that she "just fell out of the van on top of" petitioner. The Comptroller subsequently accepted the hearing officer's recommendation to deny benefits.

Petitioner commenced this CPLR article 78 proceeding to vacate, annul and set aside the Comptroller's decision as unsupported by substantial evidence, and requesting a judicial determination that she is entitled to RSSL 607-c (a) disability benefits. The Appellate Division unanimously upheld the Comptroller's denial of benefits, concluding the inmate's fall onto petitioner was not a disobedient or affirmative act, adding that testimony established the inmate "could barely walk or stand unassisted" and "simply lost her footing and fell" (161 AD3d 1495, 1497 [3d Dept 2018]). We granted Walsh leave to appeal (32 NY3d 905 [2018]). I would affirm, albeit without fully adopting the rationale of the Appellate Division.

II.

In a CPLR article 78 proceeding reviewing an agency determination after an administrative hearing, this Court's review is limited to whether the decision is supported by substantial evidence (Matter of Kelly v DiNapoli, 30 NY3d 674, 684 [2018]). "Where the rationality of an agency's determination is based on the interpretation of a statute, this Court must consider the language of the statute as well as the legislative intent" (Matter of Brookford, LLC v NY State Div. of Hous. & Community Renewal, 31 NY3d 679, 684-85

[2018]). "Although the proper interpretation of a statute ordinarily presents an issue of law reserved for the courts, this Court has recognized that '[a]n administrative agency's interpretation of [a] statute it is charged with implementing is entitled to varying degrees of judicial deference'" (Matter of Greene [New York City Dept. of Personnel—Sweeney], 89 NY2d 225, 231 [1996], quoting Matter of Rosen v Public Empl. Relations Bd., 72 NY2d 42, 47 [1988]). "By contrast, where 'the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency'" (id., quoting Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]).

The majority correctly states this appeal presents a question of statutory interpretation not subject to administrative deference, and that under the applicable standard of review we look to the plain language of the text, construing the law as a whole (majority op at 4-5). I also share the view that when the legislature has left a term undefined, we may look to dictionaries for guidance (majority op at 6-8). This ends my agreement with the majority analysis, for the text, legislative scheme and history require volitional behavior on the part of the inmate, and, therefore, the statute does not, as the majority concludes, encompass involuntary physical movement.

A.

"The primary consideration of courts in interpreting a statute is to 'ascertain and give effect to the intention of the Legislature'" (Riley v County of Broome, 95 NY2d 455, 463 [2000], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a], at 177).

"[T]he plain meaning of the statutory text is the best evidence of legislative intent" (People v Cahill, 2 NY3d 14, 117 [2003], citing Riley, 95 NY2d at 463). "In construing statutory provisions, the spirit and purpose of the statute and the objectives sought to be accomplished by the legislature must be borne in mind" (Matter of Hogan v Culkin, 18 NY2d 330, 335 [1966]).

RSSL 607-c (a) provides, that

> "[a]ny [] correction officer [] who becomes physically or mentally incapacitated for the performance of duties as the natural and proximate result of an injury, sustained in the performance or discharge of [such officer's] duties by, or as the natural and proximate result of any act of any inmate or any person confined in an institution under the jurisdiction of such county, shall be paid a performance of duty disability retirement allowance."

Petitioner bears the burden of establishing the statutory requirements, including demonstrating that the incident in which she sustained her injuries was "'the result of any act of any inmate'" (Matter of Traxler v DiNapoli, 139 AD3d 1314, 1314 [3d Dept 2016] [internal citations omitted], quoting Retirement and Social Security Law § 607-c [a]).

The word "act" is not defined in the RSSL, but when the legislature adopted this word in the first round of POD benefits legislation, Black's Law Dictionary defined an "act" as something that "[d]enotes external manifestation of [an] actor's will" (Black's Law Dictionary 25 [6th ed 1990], citing to Restatement (Second) of Torts § 2).[1] The definition

---

[1] The majority's reliance on the Seventh Edition of Black's Law Dictionary as the relevant dictionary definition at the time section 607-c was enacted (majority op at 6-7, 6 n 2) is misplaced. RSSL 507-b and 507-c, on which 607-c was based, were passed in 1996 and

goes on to explain that "act" means "expression of will or purpose, carrying idea of performance; primarily that which is done or doing; exercise of power, or effect of which power exerted is cause; a performance; a deed. *In its most general sense, this noun signifies something done voluntarily by a person*" (id. [emphasis added]). Similarly, the Merriam-Webster Dictionary in circulation at the time, defined an act as "the doing of a thing" and "something done voluntarily" (Merriam-Webster Collegiate Dictionary 11 [10th ed 1996]). The current Eleventh Edition of Black's Law Dictionary generally retains this same definition (see Black's Law Dictionary 30 [11th ed 2019] [defining an act as "(s)omething done or performed, esp(ecially) voluntarily" and "(t)he process of doing or performing; an occurrence that results from a person's will being exerted on the external world"]). Other

---

1997, respectively (see infra), in other words, prior to the publication of the Seventh Edition. The majority and I agree that the term "act" in these three RSSL sections carry the same meaning. Therefore, the relevant dictionary definition for purposes of analyzing RSSL 607-c is that which is provided in Black's Sixth Edition. The Sixth Edition's citation to the Restatement (Second) of Torts also does not change the definition offered from one encapsulating the commonly understood meaning of "act" to a specialized meaning only relevant in tort law. The citation to the Restatement (Second) of Torts follows only after the first definition of "[d]enotes external manifestation of actor's will" and not any other secondary or clarifying definitions and explanations afterwards (see Black's Law Dictionary 25 [6th ed 1990]). Furthermore, the definition of "act" goes on to define various specific acts in particular legal contexts, such as a "criminal act" or a "private act" (see id. at 25-26), suggesting that the main definition that I quote is meant to be the general and common understanding of the word "act." Regardless, as I discuss, the definition of "act" has continued to focus on the volitional nature of the conduct. It is irrelevant that the Sixth Edition, or any dictionary for that matter, defines "involuntary" or "fall" as an "act," as noted by the majority. Those definitions do not contemplate the will of the actor or the conduct, but rather describe the occurrence of the event itself. In this appeal, we must ascertain the definition intended by the legislature, which used the word "act" to mean some conduct on the part of inmates, not merely their presence at or the nonvolitional triggering of a particular incident.

current dictionary editions also define "act" as "something done voluntarily" (Merriam-Webster Dictionary Online, Act, available at https://www.merriam-webster.com/dictionary/act), "something that you do" (Cambridge Dictionary, Act, available at https://dictionary.cambridge.org/us/dictionary/english/act), and "a single thing that someone does" (MacMillan American English Dictionary, Act, available at https://www.macmillandictionary.com/us/dictionary/american/act_1).   Thus, while "act" encompasses a broad range of conduct, contrary to the majority's view, the ordinary import of the term does not include that which by definition is excluded, namely nonvolitional or involuntary physical movement (majority op at 6-8).

It follows that the term "act," as used in RSSL 607-c, does not include conduct by actors who make no effort to exert their will on the world.  The Sixth Edition of Black's Law Dictionary defines "voluntary" as, inter alia, "[u]nconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself" as well as "[d]one by design or intention" and "[p]roceeding from the free and unrestrained will of the person" (Black's Law Dictionary 1575 [6th ed 1990]).  The same edition defines "involuntary" as "[w]ithout will or power of choice; opposed to volition or desire" and states that "an involuntary act is that which is performed with constraint [q.v.] or with repugnance, or without the will to do it" (id. at 827). Similarly, the Eleventh Edition of Black's Law Dictionary defines "voluntary" as "[d]one by design or intention" (Black's Law Dictionary

1886 [11th ed 2019] [giving "voluntary act" as an example]),[2] and defines "involuntary" as "[n]ot resulting from a free and unrestrained choice; not subject to control by the will" (id. at 991).[3]  Thus, even if the word "act" includes involuntary actions, this does not necessarily encompass nonvolitional actions, which are, simply put, unintended accidents. In other words, "involuntary acts" denote acts that lack free will, and can mean coerced yet conscious or intentional acts.

The majority assigns undeserved significance to the reference in the Seventh Edition of Black's Law Dictionary to the Model Penal Code, as no such reference existed in Black's Law Dictionary at the time the legislature adopted the phrase "act of an inmate." Regardless, as explained (see dissenting op at 8 n 2), the Model Penal Code reference was added for nuance, not as the source for the commonly understood and leading definition of "act."  Nor does the majority's reference to our State's Penal Code assist in resolving the definitional question presented by the RSSL, a civil statute. Although Penal Law §§ 15.00 (1) and (2) distinguish between "act" as a "bodily movement" and  "voluntary act" as "a

---

[2] While the majority is correct that the Seventh and Eleventh Editions of Black's Law Dictionary quote the Model Penal Code's definition of "act," the inclusion of that quotation was new in the Seventh Edition.  As the editors explain, such quotes are meant to "round out the treatment of various terms" and were picked due to their "temporal and geographic range, aptness, and insight" (Black's Law Dictionary x [7th ed 1999]).  In the Eleventh Edition, the editors further clarified that "[m]ost quotations are included because they provide information or nuances that would not otherwise be available within the strict confines of a traditional definition" (Black's Law Dictionary xxxi [11th ed 2019]).  Thus, the quotation to the Model Penal Code is best understood as illustrating an unfamiliar definition of the word "act," rather than its general, commonly understood meaning.

[3] As the majority acknowledges, the Seventh and Eleventh Editions of Black's Law Dictionary contain the same definitions (see Black's Law Dictionary 833, 1569 [7th ed 1999]) (majority op at 6-7 n 2).

bodily movement performed consciously as a result of effort or determination" (Penal Law §§ 15.00 [1], [2]), we have "interpreted [the definition of "act" in section 15.00 (1)] to mean the actus reus or 'wrongful deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability'" (People v McKnight, 16 NY3d 43, 48 [2010], quoting People v Rosas, 8 NY3d 493, 496 n 2 [2007] [other citation omitted]). Similarly, the definition of "act" in Model Penal Code § 1.13 is not "independently important" and is rather meant to have "influence upon the meaning of important Code provisions" (MPC Part I Commentaries, vol. 1, at 210). "[The definition's] validity is, therefore, best appraised in the specific context of the Code provisions where the term[ ] appear[s]" (id.). The definition of "act" and its accompanying distinctions contained in the Penal Law and the Model Penal Code must therefore be viewed in the particular context of criminal law, namely to distinguish between actus reus and mens rea. That distinction is wholly unrelated to our interpretation of a word contained in the RSSL, a civil pension benefit statute. Indeed, nothing in RSSL 607-c (a) or the statutory framework suggest that the legislature intended to align the meaning of the RSSL with terms as defined in the Penal Law.

B.

Apart from the absence of support for the majority's interpretation of the express language of RSSL 607-c, the statutory scheme further demonstrates the error in the majority's reasoning. "It is a well-settled principle of statutory construction that a statute or ordinance must be construed as a whole and that its various sections must be considered

together and with reference to each other" (People v Mobil Oil Corp., 48 NY2d 192, 199 [1979] [internal citations omitted]). We have an "obligation to harmonize the various provisions of related statutes and to construe them in a way that renders them internally compatible" (Matter of Aaron J., 80 NY2d 402, 407-408 [1992], citing Mobil Oil Corp., 48 NY2d at 199-200; Gaden v Gaden, 29 NY2d 80, 86 [1971]; McKinney's Cons Laws of NY, Book 1, Statutes §§ 97, 98). Further, "[a]ll parts of a statute must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute and every part and word thereof" (People v Pabon, 28 NY3d 147, 152 [2016], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 98 [a]; see also, e.g., People v Williams, 4 NY3d 535, 538 [2005] [declining to treat a peace officer as an ordinary citizen in the arrest context because it would render the legislature's purposefully drawn differences in arrest powers as between the two meaningless]).

The legislature provided for a two-track disability scheme: (1) an ordinary disability retirement allowance under RSSL 605 available for members with 10 years of service or those who have suffered an accident without reference to years of service, which generally provides for 1/3 of the officer's final average salary; and (2) a performance-of-duty disability retirement allowance under RSSL 607-c which provides 75% of the member's final average salary, regardless of years of service.[4] Thus, we must interpret the statute in

---

[4] POD benefits are reduced by any benefit payable under the Workers' Compensation Law (see RSSL 64 [a]), but according to the State, POD benefits are still more favorable notwithstanding the reduction.

a manner that furthers the clear legislative intent to provide a more generous retirement allowance under RSSL 607-c for a particular class of incapacitation-causing events, to be distinguished from the circumstances permitting for ordinary disability benefits under RSSL 605 which, with exceptions not relevant here, are available after 10 years of service. The majority's interpretation undermines this legislative goal by expanding the scope of POD benefits, injecting tension in a statutory scheme structured to provide ordinary disability benefits as a default, and enhanced POD benefits on a more limited basis (see, e.g., Retirement and Social Security Law §§ 605, 607-c [b], 607-c [c]). Analyzing the word "act" in the context of the overall RSSL disability benefits scheme, wherein the legislature provided for varying sums of disability retirement allowances, lends further support to the conclusion that "act" is intended to mean only volitional conduct.

## C.

Although I conclude that the word "act" as used in RSSL 607-c (a) may plainly be interpreted to refer solely to volitional conduct, the majority's view that the word unambiguously includes involuntary physical movement is based on a patchwork of secondary sources that are anything but clear. Even if "act" could be considered ambiguous in light of the terms of the statute and legislative scheme, any doubt as to the intended meaning of the word is put to rest by the legislative history of POD benefits, and makes clear that the legislature did not intend the enhanced pay benefit of RSSL 607-c (a) to apply when an officer is incapacitated from an inmate's nonvolitional conduct, as in this proceeding.

"In analyzing a statute [], courts look to [its] spirit and purpose, and the objectives of the enactors must be kept in mind" (Matter of Albano v Kirby, 36 NY2d 526, 530-531 [1975], citing Hogan, 18 NY2d at 335).  Of course, where there is ambiguity, "we may examine the statute's legislative history" (Roberts v Tishman Speyer Props., L.P., 13 NY3d 270, 286 [2009], citing Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]).

"These principles of statutory construction assume particular significance where . . . the Legislature has spoken to an issue simultaneously in separate laws, sometimes cross-referencing them, and has repeatedly adopted and amended pertinent provisions piecemeal throughout decades" (Matter of Sutka v Conners, 73 NY2d 395, 403-404 [1989]).  "Literal meanings of words are not to be adhered to or suffered to 'defeat the general purpose and manifest policy intended to be promoted'" (Matter of Petterson v Daystrom Corp., 17 NY2d 32, 38 [1966], quoting People v Ryan, 274 NY 149, 152 [1937] [other citations omitted]).

Section 607-c was passed in 1999 after two other provisions, RSSL 507-b and 507-c, were enacted to provide POD disability benefits to correctional officers.  In 1996, RSSL 507-b was the first of the three bills passed.  It provided POD disability retirement benefits to state correctional officers.  The legislative history of that bill shows that the intent of the legislature was to provide benefits to officers "who become physically or mentally incapacitated as a result of an injury sustained in the performance or discharge of their official duties" (Mem of State of NY Executive Chamber, Bill Jacket, L 1996, ch 722, at

5). What prompted the passage of this legislation was the growth of the inmate population in state prisons, which resulted in "a system that [wa]s being operated at 133 percent of capacity" (Mem of Support, Bill Jacket, L 1996, ch 722, at 4). The memorandum in support noted that "[t]he strain and tension created by this situation has manifested itself in an increase of altercations between inmates and between inmates and officers," leading "officers [to] have [] to retire because the injuries they sustained prevent them from performing the duties of the job" (id.). As the Governor's approval memorandum states, enhanced benefits were warranted because correctional officers "must come into daily contact with certain persons who are dangerous, profoundly anti-social, and who pose a serious threat to their health and safety" (Gov Approval Mem No 129, Bill Jacket, L 1996, ch 722, at 5).

Shortly thereafter, RSSL 507-c was passed in 1997 to provide POD disability benefits to New York City correctional officers, and RSSL 607-c soon followed in 1999 to cover county correctional officers. The language in RSSL 607-c (a) virtually mirrors the language in RSSL 507-b (a) and 507-c (a).[5]

"[T]he [l]egislature intended that [RSSL] 607-c provide the same benefits to county employees, who serve in the same capacity and face the same dangers resulting from increased altercations among inmates and between inmates and correction officers, as those provided by [RSSL] 507-b" (Matter of Parish v DiNapoli, 89 AD3d 1315, 1317 [3d Dept

_____

[5] As the majority notes, the adoption in RSSL 507-b (a) and 507-c (a) of "an act of any inmate" rather than "any act of any inmate" as found in section 607-c is a difference without distinction for our purposes (majority op at 6 n 1).

2011], citing Senate Mem in Support, 1999 McKinney's Session Laws of NY, at 2015-2016; see also Matter of Naughton v DiNapoli, 127 AD3d 137, 140-141 [3d Dept 2015] [using and comparing legislative history of sections 507-b and 607-c to determine if the legislature intended to cover certain injuries]).  The legislative history for both these sections broadly shows an intent to extend the same benefits provided by RSSL 507-b to the relevant correctional officers in each corresponding bill.  For example, RSSL 507-c was intended to provide disability retirement benefits to city correctional officers in recognition "that every correction member works, performs the same duties, and faces the same dangers and risks on a daily basis" and "granting [city] officers this benefit would remedy the present inequity [between state and city officers]" (Letter from Sen Ceasar Trunzo, Bill Jacket, L 1997, ch 622, at 4).  This expansion of benefits was necessary because city correction officers "work with dangerous inmates in a hostile work environment on a daily basis" (Letter from William Kwasnicki, Bill Jacket, L 1997, ch 622, at 14).  Similarly, the Budget Report for RSSL 607-c directly stated that "[s]ponsors of the legislation claim that county . . . correctional officers should be entitled to the same disability benefits as their counterparts in state service" and referenced the 1996 bill that passed section 507-b (Budget Report, Bill Jacket, L 1999, ch 639, at 6).  Further, the Sponsor's justification for the bill acknowledged that correctional officers are "constantly exposed to violence, assault, transmissible disease and other life threatening situations" (Sponsor's Mem, Bill Jacket, L 1999, ch 639, at 4).

As the legislative history reveals, the legislature intended the enhanced POD disability benefit to address increased risks to correction officers due to their daily interactions with an inmate population the legislature viewed as dangerous and anti-social.[6] Put another way, the legislature provided a generous disability retirement benefit in recognition of the fact that correction officers work in an unsafe environment and may suffer career-ending injuries due to interactions with inmates.

The majority fails to persuade with its comparison to RSSL 607-c (f), which provides for POD benefits to officers employed in Westchester County for incapacitating injuries proximately caused by "an intentional or reckless act of any civilian visiting, or otherwise present at, an institution under the jurisdiction of such county" (Retirement and Social Security Law § 607-c [f]). The majority asserts that this section demonstrates that the legislature uses limiting language when it intends to narrow the meaning of "act" (majority op at 8). I agree, but the limiting language found in that section—"an intentional or reckless act"—only applies to volitional conduct, which is not the same as intentional conduct. Volitional conduct sometimes but not always intends the result while intentional conduct seeks to achieve a particular result. Thus, RSSL 607-c (f) does not support the majority's view, but instead confirms my interpretation of RSSL 607-c (a), because 607-c (f) presumes that the acts at issue are volitional.

---

[6] As this Court recognizes, "[c]orrection officers are tasked with the formidable and critical responsibility of protecting the safety of inmates and coworkers while maintaining order in correctional facilities" (Rivera v State of New York, slip op at 1 [decided today], citing Arteaga v State, 72 NY2d 212, 217 [1988]).

Significantly, now, under the majority view, an inmate misstep may result in payment of POD benefits. This is not what the legislature intended. No less troubling, under the majority's definition, if an inmate faints and falls on a correction officer the fall would be an "act" that could serve as the basis for POD benefits (cf. Matter of Laurino v DiNapoli, 132 AD3d 1057 [3d Dept 2015] [denying POD benefits to correctional officer injured while assisting an inmate who collapsed during a seizure because the legislature did not contemplate this situation as an "act of any inmate" falling within the meaning of section 507-b (a)]). The majority's interpretation is also in contravention of the legislative purpose to provide generous pension benefits because of the injuries attendant to dangers faced by correction officers in maintaining order among prisoners (see Sponsor's Mem, Bill Jacket, L 1996, ch 722, at 4 [justifying the necessity of POD benefits to compensate officers for the "increase of altercations between inmates and between inmates and officers"]; Letter from Danny Donohue, Bill Jacket, L 1990, ch 639, at 20 [supporting the passage of POD benefits because correctional officers "are charged with front line law enforcement and the supervision of prisoners in county jails and are constantly exposed to violence, assault, transmissible diseases and other life threatening situations"]; see generally Laurino, 132 AD3d 1057).

In sum, the majority's interpretation is unsupported by the common understanding that an "act" is an "expression of will or purpose" (Black's Law Dictionary 25 [6th ed 1990]. Moreover, the majority fails to properly consider the legislative scheme, "the spirit and purpose" of the statute, and "the objectives of [its] enactors" (Albano, 36 NY2d at 530-

531, citing <u>Hogan</u>, 18 NY2d at 335; <u>see also</u> <u>Riley</u>, 95 NY2d at 463, quoting McKinney's

Cons Laws of NY, Book 1, Statutes § 92 [a] at 177).  The intended effect of the operation

of the two-track disability benefits statutory scheme, as explained by the legislative history

of RSSL 607-c, is to provide enhanced POD benefits to mitigate the effects of disabling

injuries caused in an inherently dangerous prison environment.  Thus, for purposes of

RSSL 607-c POD benefits, an "act" means volitional conduct, not, as the majority

concludes, "any conduct originating from an inmate's internal processes, including

volitional and nonvolitional movements" (majority op at 9).[7]

---

[7] The concurrence posits a strained interpretation of RSSL 607-c (a) as providing "two separate paths by which an officer may demonstrate the entitlement to recovery under the statute" (concurring op at 2).  On one hand, if correct, this reading removes the performance of duty requirement from path two and grants benefits for all injuries resulting from an act of an inmate, no matter if such injuries were not sustained in the performance of an officer's duties and ultimately defeating the purpose of POD benefits.  On the other hand, if we assume that injury resulting from any act of any inmate can only be sustained in the performance of a correction officer's duties, this reading would render the distinction itself superfluous.  If path one encompasses all disabling injuries caused by the conduct of an inmate and sustained by an officer while performing their duties, including injuries resulting from the nonvolitional acts of inmates, then there is no need for the second path of recovery for volitional acts because all disabling injuries are included within the first path.  Moreover, if the legislature intended to provide an enhanced disability benefit to officers injured while working in a correctional environment and without regard to whether an inmate acted or not, as the concurrence suggests in its interpretation of the legislative history (<u>see</u> concurring op at 5-7), the legislature simply would have omitted the phrase "any act of any inmate" and expressly allowed POD benefits to apply when an officer is injured in the performance of their duties.

III.

Under the proper interpretation of RSSL 607-c (a) as I have described, it is readily apparent that petitioner failed to satisfy her burden to show her entitlement to POD benefits. According to the testimony from petitioner and her co-officer, the inmate was unable to stand and, therefore, fell as she attempted to descend from the vehicle due to her allegedly intoxicated or drug-induced condition. Section 607-c does not encompass injuries resulting from this type of inmate slip and fall, which was involuntary and in no way volitional. Indeed, the inmate did not manifest the type of dangerous, anti-social characteristics that lead to incapacitating injuries to correction officers that the legislature sought to mitigate with an RSSL 607-c (a) POD disability benefit.

I would affirm the Appellate Division because the Comptroller's decision is not irrational, or based on an erroneous determination of law, and there is record support for the Comptroller's conclusion that any disability was not the result of an act of an inmate within the meaning of RSSL 607-c (a).

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Judgment reversed, with costs, and matter remitted to the Appellate Division, Third Department, with directions to remand to respondents for further proceedings in accordance with the opinion herein. Opinion by Judge Feinman. Judges Fahey, Garcia and Wilson concur, Judge Wilson in a concurring opinion. Judge Rivera dissents in an opinion in which Chief Judge DiFiore and Judge Stein concur.

Decided November 25, 2019